Our next case this afternoon is case number 4141013, The People v. Christopher Austin. And for the appellant, we have Ms. Borland. Is that correct? And for the appellee, we have Ms. Wyckoff. You may proceed, counsel. Good afternoon, Your Honors. Again, my name is Caroline Borland, and I represent the appellant, Christopher Austin. As this Court is aware, we've raised three issues in the brief. In light of the State's concession to our One Act, One Crime doctrine, and in the interest of time, today I would like to focus on our ineffective assistance of counsel claim, and then, if time permits, touch on the sentencing issue as well. With respect to our claim that Mr. Austin was denied effective assistance of counsel, the basic service that counsel must provide to a defendant is to subject the State's case to meaningful adversarial testing. In this case, that did not occur. In fact, it is impossible to tell if the jury's verdict was based on the evidence presented by the State or that presented by the defense. As the prosecutor told the jury in closing, it could, quote-unquote, throw out all of the State's case and still find Mr. Austin guilty, based on that evidence that had been presented by the defense. Specifically, counsel elicited testimony from Mr. Austin that on June 18, 2013, he knowingly met Tracy Jo Shingle, the confidential informant, while in possession of crack cocaine, with the intent to share some of that cocaine with her. Counsel told the jury that this was a defense because delivery means intent to sell, and that merely giving someone a drag off your cigarette or something like that, sharing drugs, was not delivery. However, the jury was instructed in deliberations that delivery actually means to transfer possession or intent to transfer possession, and that a delivery may occur, contrary to what counsel said, with or without the consideration of any money or any other consideration. Thus, just as the State said, when Austin admitted that he was going to give some crack to Tracy Jo Shingle for her to use, he would be transferring possession to her, making him guilty of an intent to deliver, as the State alleged. On appeal, the State takes a different position than it took at trial, and says that using drugs together with another user does not constitute delivery. They cite People v. Kootz to support that position. However, like defense counsel's argument below, that's a misstatement of the law. Kootz actually talks about two different categories of cases where two individuals are using drugs together. In one case, the two individuals form the plan to smoke together. They go out and jointly acquire those drugs, and then they come back and use those drugs together without any intent to ever convey any of those drugs to a third party. In that case, neither of the two users is guilty of delivery. However, Kootz also talks about the instance where one of those two co-users went out and got the drugs on his own. In that case, the defendant is definitely guilty of delivery because he acted as the link between the drug and the user. Indeed, that defendant was guilty even when the plan all along was for the defendant to get the drugs himself, and when the co-user actually gave the defendant money to do so. So here, there's no denying that Christopher Austin admitted that he agreed to act as the link between the drugs and Tracy Jo Shingle. So therefore, counsel left the jury with no legal choice but to convict Mr. Austin. The Illinois Supreme Court of People v. Chandler holds that when counsel provides the jury with no legal choice but to convict the defendant, they're ineffective. In Chandler, the defendant was charged with residential burglary and murder based on the fact that while he and his co-defendant committed the residential burglary, the victim who lived in that house was stabbed. Prior to trial, the defendant gave a statement admitting to the residential burglary, but saying it was his co-defendant who killed the victim, and he was not involved in the stabbing and had no idea that would occur. At trial, the defense counsel urged the jury to believe the defendant's pre-trial statement and said, I don't think if you take a realistic view of this evidence that you can find the defendant guilty of murder. However, the jury was ultimately instructed on the law of accountability, which did explain that you are legally responsible for the actions of your co-defendant. So the Illinois Supreme Court found that the ultimate error in counsel's strategy was that even if she succeeded in convincing the jury to believe the defendant's pre-trial statement, she left the jury with no legal choice but to convict the defendant, which amounted to a failure to meaningfully test the state's evidence, which was ineffective. Here as well, where defense counsel left the jury with no legal choice but to convict Mr. Austin, she failed to subject the state's case to meaningful adversarial testing. Excuse me, counsel. At times, I'm sure you're aware that at times this court has determined that it's not appropriate to make an assessment as to whether or not there was ineffective assistance of counsel and possibly defer that to a post-conviction petition where we can have a record that is distinctly for the issues before us. Should we do that here? No, Your Honor. For one thing, all of these errors were things that occurred on the record. This error as well as the additional error in failing to object, which I'll talk about subsequently. And the Illinois Supreme Court actually tells us that if we don't raise them on direct appeal, they're forfeited. And here, there are two Illinois Supreme Court cases on point on precisely each of the errors. And in both cases, the Illinois Supreme Court reversed on direct appeal due to the error. One is Chandler, obviously, the one I've just discussed, where you fail to subject the state's case. The other is the recent case of People v. Simpson, where the Illinois Supreme Court found counsel ineffective in failing to object to an immiscible hearsay statement in which the defendant confessed his guilt. The court could envision no strategy why counsel would not object, so reversed and remanded. Here as well, certainly even with respect to the first error, the only thing we don't know from this record is why defense counsel did what she did. What if her client insisted on testifying and insisted that this is what happened, this is my story, I think the jury will believe me, I demand that you represent me and let me tell my story? Well, in the first case, she needs to advise him before trial, don't provide that testimony. You'll be admitting to your guilt if you do. If he continues to insist, then if I were the defense attorney, I would make sure in court before he testifies to tell the court, my client wants to testify, I've advised him against it, get that on the record, and will you please admonish him. That way he takes it very seriously that counsel believes this cause. And then, while he does have the right to testify, he can get up and testify, but counsel still controls the strategy of the case. This is what the cases that I've cited, Salgado and Baines say, so don't ask him the questions that elicit this guilt. If he ends up testifying on his own eventually, a cross-examination or something else, then obviously it's not defense counsel's fault and she's covered herself. But here, we know counsel believed in this defense because she advanced it vigorously in opening and closing. So we also, we know for that reason that counsel, you know, her duties are not to just elicit questions on the witness stand, which she did here, but also to advise the defendant. So even if he insisted, counsel would still be found ineffective. And also, whether or not counsel's strategy in that regard was sound, counsel also failed to object when the state presented evidence and made arguments designed to have the jury believe Shingle when she said that he and Mr. Austin tended to sell to her because she had bested so many drug dealers in the past. This, even more so, doesn't require any off-the-record discussion because this is truly, you don't allow the state to present this kind of evidence. There's no strategy where you could say counsel had a reason to let the state say, believe her because she's done this in the past, particularly since counsel's theory depended on the jury rejecting her testimony. Specifically, counsel first failed to object when the state introduced all of this case, before even presenting a single piece of evidence about what happened here, by saying the person that you're going to hear from today, Tracy Jo Shingle, is this reliable informant. Detective Carliker got on the stand, he talks that the state elicits from him that he's worked with Shingle three times in the past, and that in each occasion she was provided reliable and accurate and truthful information. The information she provided to the police led the police to arrest these individuals, and it led, she actually purchased drugs from each of these people in those cases, and it led to a substantial amount of drugs in one case, even a gun. Defense counsel also failed to object when, in closing, the state used this evidence to say, yes, we do have this dispute between what these people are saying, but you have to believe Shingle. Again, the state introduced initial summation by talking, what is this case? You heard the evidence. This is the case, Tracy Jo Shingle, this reliable witness who always has proven successful in the past. She's been very successful. She's always proven reliable. When they talk about the differences in her testimony, the state says, how do you know she was going to do it in this case? Because the whole purpose of this case was to buy drugs. Just like she'd done in the past, she was going to buy drugs that day. Counsel should have objected to this testimony because specific instances where a witness is truthful, has been truthful in the past, cannot be used to support their credibility. Certainly, if an allegation of bias has been made, you can rebut that bias with specific instances in the past. But here, when the state elicited this evidence, there had been no allegation from the defense that Shingle was a biased witness. Therefore, when the state gets this evidence right at the start of trial, they set up Shingle immediately as a witness to be believed by the jury. They hear Detective Carliker say, not only has she been truthful in the past, she provides accurate and reliable information on the real drug dealers here. So when the jury ultimately heard from Shingle, they would be disinclined to look for any inconsistencies in her testimony, as the federal cases I've cited show. And then even if they did find those inconsistencies, they'd be less likely to give mine to them, because they always can resort back to this idea that this is someone who knows who the drug dealers in Springfield are. She always buys drugs in the past, and this is what she's doing here. Counsel's failure to object to this evidence, since there's no strategic reason not to allow this in, since it's an admissible, was ineffective. And again, even though counsel later did challenge Shingle's credibility, the state, first of all, you can't, the state, like I've already said, you can't introduce it first. But even if counsel had somehow invited it, the problem is the state went beyond just saying, in the past, she was truthful. But they actually said, she's reliable, she makes these cases. And that's what all of the cases in the brief show in federal courts that have addressed this issue. When you cross that line, that's when it becomes admissible. Counsel's failure to object to that was deficient. Counsel's two errors undermine confidence in the outcome of this trial. First of all, as Chandler held, when your defense nearly provides an alternative theory of guilt, that in and of itself undermines confidence in the outcome of this trial. However, here, there's even more confidence undermined, or even less confidence in the outcome of trial, because this case hinged so deeply on Shingle's credibility. Shingle was the only witness who could say that Christopher Austin agreed to sell her drugs. And as we know, the jury struggled with Shingle's credibility. They asked during deliberations for an instruction on delivery, and then they were deadlocked at a certain point. Since Shingle had said Austin intended to sell her drugs, and since defense counsel even agreed, if you hear evidence of an intent to sell, he's guilty, the fact that the jury is looking for help on what delivery means, they wouldn't have even needed to go there if they believed her. So the fact that they asked for delivery, instruction on delivery, and were subsequently deadlocked, does show that they weren't necessarily inclined to believe this case based on Shingle's testimony alone. There certainly was reason for the jury to doubt Shingle's testimony, because what she said was supposed to happen, what she told Detective Carliker would happen, was not even close to what happened. According to Detective Carliker, Shingle told him that the plan would be, he would give her $250, she would buy an 8-ball from Christopher Austin, which Detective Carliker explained is 3.5 grams, and this transaction would occur in the parking lot of Jamal's. Ideally it would occur at Detective Carliker's car, worst case scenario, it would occur quickly in Austin's car. However, when Austin showed up, Shingle immediately gets out of the car, according to her testimony, goes straight to Austin's car, gets inside, they drive off, and when Austin is subsequently detained a few blocks away, he only has 7.1 grams of cocaine in one bag. That's double the amount of drugs that Shingle requested. He has no other baggies to give it to her, to provide any of that to her. He has no scale to measure out any of those drugs to her. He has not a single other piece of evidence common to drug dealers. As the officer who searched Austin said, it's uncommon to not have any of this stuff in a drug deal. So certainly, all that Detective Carliker heard Shingle say was, he said she called Austin and asked to buy an 8-ball. Certainly, since there was prior time, they had set up this deal well in advance, Shingle could have certainly called Austin for some other reason in the past and said, hey, meet me here for this reason, and then she could have called and hung up, as defense counsel argued at trial. Or, even if Shingle did, at that time, say, I need to buy an 8-ball, Austin could have easily met her just intending to go help her find an 8-ball. That makes more sense than him showing up with double the amount. In that case, if he was just going to help her find someone, maybe his own drug dealer, the drugs he possessed would not be with an intent to deliver, and therefore he would not be guilty. So, there was some problems with the state's evidence.  Obviously, when she gave an alternative theory of guilt, then the jury didn't need to pay any attention to the problems in the state's case at all. It doesn't matter if you pick the state or you pick defendant, he's guilty, as the prosecutor said over and over again. Yet, even if there had been any chance that the jury was going to buy defense counsel's theory, or whether or not it was going to reject defense counsel's theory, the one thing that defense counsel's theory hinged on was that you absolutely had to reject Shingle's testimony. So, counsel's error in allowing the state to unfairly bolster Shingle could have tainted the outcome of this trial. When the jury was in that deadlock, all it takes is one juror to say, you know what, she did this before, she knows who these drug dealers are, so let's resolve this case in her favor. It just turns on that. So, that's similar to the prejudice analysis that the court used in Simpson, where defense counsel allowed an inadmissible hearsay confession from the defendant. After the court found counsel deficient in doing so, the court said, you know what, the prejudice question in this case is close. Yes, this was a damning confession from the defendant, but you also have two of the defendant's accomplices who said he was there, and you have an independent eyewitness who had identified the defendant before trial, but the Supreme Court recognized maybe they used this confession, and that maybe was enough to require a new trial. The same thing should be said here. There's a substantial risk. You can't tell if this case came down to the jury believing the defense or state evidence, and so for that reason, we would ask for a new trial. If this court has no questions on that, I would like to touch briefly on sentencing as well. You have until the red light lights up. Okay. If this court does not grant a new trial, it should absolutely reduce Austin's sentence or remand for a new sentencing hearing, because his 12-year sentence that he received for this offense is unconstitutional. Under the Illinois Constitution, the sentences imposed on criminal defendants must be proportionate to the nature of the offense. Twelve years for this offense is completely outrageous. This was not a case where Christopher Austin was out on the street screaming, rocks, rocks, trying to get people to come buy his drugs. In fact, he did not even try to get Shingle to buy his drugs. It was the police and Shingle, their confidential informant, who induced him to commit this offense, and then he merely showed up with a relatively small amount of drugs, the equivalent of what he used, maybe a gram more than what he used every day. And it was never going to the public. It was always going to go to the police. It is outrageous to put someone in jail for 12 years for this kind of action. There were also several statutory mitigating factors that existed in this case, the first and second being that his conduct did not cause or threaten serious harm, and he could not contemplate that his conduct would cause or threaten serious harm, in addition to the fact that these drugs were never going to the public. You mean injecting cocaine into the community isn't a harm? Well, literally, they were going to the police, so they weren't going into the community. But also, in this case, it was someone he already knew to be a fellow drug user. So I don't think he could contemplate. I mean, if it was someone, I mean, I think that's covered by the offense, the fact that you're putting drugs in someone's hand. But when someone calls him, it's not any additional harm. Like, that harm is captured by the offense itself. But you also look to the fact that when police pulled him over, he did not try to flee. He didn't endanger anyone at that time. He never had a gun, no indication that he was violent. Also, as I've touched upon, his conduct was induced by someone else. And even if you agree that he was showing up that day to sell shingle drugs, the fact that he had nothing common to drug dealers and doubled the amount she requested without any means to give it to her, kind of shows that this isn't something he normally does, that he might not have committed this offense but for being induced. Also, his character and attitude indicate that that was also mitigating. He wrote the court a letter prior to sentencing that he continued to say, I did not intend to sell the shingle. I was only going to share my drugs with her. But he wasn't outraged. He didn't say, I was set up. This is a bogus case. He said, I'm grateful to shingle. This has been a real eye-opener to me. I hope she continues to stay off drugs. I want to stay off drugs now. I've seen what my absence does to my family. My mom is sick. My absence is hurting her. I have a son. I have nephews. They're all looking up to me. I want to change. History has shown that when he has proper direction in his life, he can be successful. Although he first started using cocaine at the age of 15 or 16, and dropped out of school around the same time, he went to live with his father in Missouri for about two years after that point. At that time, he obtained his GED, he got a barber certificate after completing cosmetology school, and he worked part-time. Obviously, he came back to Illinois and found some trouble. He was convicted of the same offense he was convicted of in this case, and in mall and probation for that, he was found in possession of firearm ammunition and got another conviction. So, while those convictions required class-X sentencing in this case, there's no history of violence, and the difference now is he has reason. He says he has reason. He has a clear plan to rehabilitate himself. He wants to open a welding business. He learned how to weld in his prior incarceration. Given that he has shown in the past, he's only going to... All right, thank you. I don't want to cut you short. Ms. Wykoff. Thank you, Your Honor. May it please the Court and Counsel. Your Honors, a defendant is entitled to reasonable, not perfect representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent. As Your Honors well know, there's two parts to being a trial attorney. There's the science of the law, and then there's your strategy, this art aspect of the law. The State's position in this case is that, given the case she had in front of her, defense counsel did an excellent job with bad facts that got thrown her way as the course of this trial went on. Defendant himself testified, and for all intents and purposes, he incriminated himself when he testified. Now, as Justice Holderwhite pointed out, we don't know if there were discussions between defense counsel and her client before the trial of her saying, hey, I really don't think you should testify. He's told me his story, and I don't think you should get up there and say that. The record is not clear if that ever happened in this case, but the fact of the matter... What about her statement in the opening statement? Didn't she reference the fact that they may hear testimony, or they would hear testimony, that he only intended to share? Right, Your Honor, and that's what at least leads the State to believe that there was some discussion between counsel and her client beforehand of whether he should testify, what he was going to say, and we don't know how she advised her client at that time. She did make reference to this argument in her opening statement, and then when the defendant testified, he admitted that, yeah, he possessed these drugs, and then he testified that he intended to share them with the confidential informant, that he didn't intend to sell them to her. Your Honor, this put counsel then in a difficult position. So counsel then basically adopted the defendant's testimony and said, you should believe him, don't believe the confidential informant. That was kind of the crux of her closing argument. Was she required to elicit the testimony, the incriminating testimony? Your Honor, in reading through her testimony, or the defendant's testimony, he told his story. I think that this idea that she was eliciting, did you share, did you sell, that's not really what happened in this case. She asked him, what happened to you this day? What's your side of the story? And that's the story that he told. The State's position is that she was then in a difficult position. She couldn't just ignore his testimony then in her closing arguments. That would, you know, arguably be poor lawyering in and of itself. But then she couldn't go testify in her closing arguments, then say, oh, don't believe what he said about wanting to share the drugs and undermine her own client's testimony. What counsel did, and what the State believes she did very well, is she took this case in total. She really, really made strenuous argument that this confidential informant was not reliable. There, of course, is some discussion about the reliability of the confidential informant's testimony. But the fact that the CI testified that she had worked with police before, that was beneficial to counsel and her strategy, that testimony that they're complaining about now today on appeal. Because had she not testified that she'd worked with police before, then counsel in her closing would not have been able to argue that, one, she was working off charges as a paid confidential informant. That was a big part of counsel's strategy. Don't believe her because she has an ax to grind. She wants her charges to go away. And, two, she was being paid as a confidential informant. Counsel argued strenuously, don't believe this confidential informant. She's being paid by the government, and she will throw anybody under the bus that she can. That testimony that was elicited then by the state was very helpful to defendant's strategy throughout this trial. Moreover, counsel made significant argument about the telephone call that Tracy Jo Shingle placed, again undercutting her credibility, arguing basically that there was bad police work in this case. The detectives didn't record the phone call. They couldn't hear what the defendant said on the phone with her. So there was significant argument outside the small scope of whether he was sharing the drugs with her. Counsel, small scope? Yeah, well, I mean, in terms of, you know, the long argument that she made in this case, she argued extensively about the reliability of the confidential informant. She relied heavily on the police work that was done in this case. And then she also argued, you should believe my client over the confidential informant, that he wasn't going to sell her drugs. They were going to do drugs together. But that testimony ended up with the prosecutor saying, throw out what I presented to you and only consider what the defendant has to say, and you have to find the guy guilty. Right, Your Honor. And one thing I do agree with defense counsel on today is, and I think that my argument in my brief was perhaps misunderstood,  the state's position is that's what defense counsel here was trying to make of the testimony that defendant gave. These are our drugs that we're going to do together. Now obviously that strategy was not successful because defendant got convicted. But the defendant is entitled to reasonable representation, and mistakes in counsel's strategy don't render her representation incompetent. That's what she was trying to do here, following unfortunately not great for her testimony by her own client. Your Honors, in terms of the confidential informant, again the information that was elicited from the confidential informant by the state, that testimony was helpful to defendant and his counsel when she then crafted her closing arguments that, you should have believed this confidential informant, she's getting paid by the police, she wants to work off charges that are pending against her, and for all intents and purposes they kind of leave her alone to do drugs herself. That was the argument that counsel really put out there to the jury. In terms of the jury instructions that went back, the state's position is that the most compelling evidence that counsel had the jurors really thinking about the issues in this case, is that they did struggle over this case. They were back there, the first question they asked for was the definition of delivery. And the delivery instruction that went back was 17.05a both parts 1 and 2. Then they asked another question, they asked if they could have a transcript of the testimony of the detective, Detective Carliker, and of the confidential informant. That's evidence that counsel's argument about don't believe the confidential informant was well placed. Their third question they sent back was that they couldn't agree, what to do if they couldn't agree on one of the two charges. And there was even discussion of whether to send back a print instruction. Don't you think that we could just as easily infer that the first question they asked was to clarify, because they were astonished that both in opening statement and during the case itself, the defendant is admitting that he's going to share drugs, and they want to make sure what delivery is. I don't understand how that shows, the other questions show that there's maybe credibility issues with the confidential informant. But the first one, and first to me, is they want to say, well, is it really delivery if you don't get anything for it? Right, your honor, and that's why... And then when they got that instruction, could they have done anything else other than convict, other than exercise lenity, which nobody really argued for. I mean, in the sense that could defense counsel actually argue, he's a mope, but he's not the worst mope in Springfield. Is that where we are? Yes, your honor. He's not the worst mope, and he's generous. He likes to share, but he's not like one of these guys that's selling. Right. And appeal to the jury's sense of justice in terms of lenity. Right, your honor. Young, no violence. Right, and your honor, in terms of the definition of delivery that went back to the jury, both parts one and three went back. And part one of the instruction reads, the word deliver means to transfer possession or to attempt to transfer possession. So the jury just as easily could have been confused about, you know, this transaction was not completed. What role does that play in this case? There was no actual exchange of drugs for money. However, there was significant evidence. Clearly the jurors did find Tracy Jo Shingle to be more credible than the defendant's own testimony. And she testified that she called him. She asked if she could purchase an eight ball of crack cocaine. Detective Carliker was in the vehicle with her when she made that call. She then said, or detective, defendant, said it would cost $250 to purchase the crack cocaine and to meet him at a convenience store. The jurors heard the testimony of both her and the defendant and ultimately found her to be more credible along with the corroborative testimony of law enforcement. But what does her credibility have to do with the fact that the defendant says, I'm going to share it and I've done it before? And the answer is that I've done it before in response to a question asked by defense counsel. Sure I was going to, I share with my friends. I've done it before. This is something I do. I don't care what the informant says if I'm on the jury. Do I? If the defendant himself and his lawyer both tell me that he shares it? They don't need the informant. If she's totally incredible, they can say, we don't have to think about that. I don't like her. I don't think she's telling the truth. But he admitted to us. He told us that he did intend to share and that he's done that. Right. And your honors, that's what's hard about this case is he did. He incriminated himself on the stand. But the issue is whether counsel was ineffective. What could she do? She could talk to the child. She could do a sidebar. She could, but. My counsel's testifying against my advice. Right, but we don't know this. I asked that he be permitted to testify somewhat in a narrative. And I'm not going to ask him a question where he admits to crime. And not only admits to crime, but tells us he's done it before. Shared drugs with friends. Your honors, if that's. . . It could be a Category B situation. If there are questions about why counsel did what she did, what the defendant thought. . . Maybe defendant was just dead set on I'm going to testify. I'm going to tell the story. You're my lawyer. You work for me. And that's what I want to do. That's his choice. He chose to do that. We don't know what she said. He doesn't choose the opening statement. Right, but they could have talked beforehand. Even if he says that's what he's going to do, why bring it up? Let the client bring it up on his own. Well, it sure would lessen the blow by counsel at least acknowledging that this is where he's going to go. It could make him look more credible to the jurors. If she fronts that in her opening statement, knowing based on their attorney-client discussions, which this is all hypothetical because I have no idea if this happened or not. But then if she at least plants that seed in opening arguments, and the defendant testifies that way, perhaps that then makes him seem more credible than the confidential informant. Is there a statement on the record about the defendant testifying? He was admonished. I'm asking whether or not counsel was asked, is your client going to testify? No, not as of today or something along those lines. Your Honor, I don't recall. If there were, would that make a difference about opening statement? If there was the expectation that he wasn't going to testify, but I give that kind of opening statement, and then he says, well, what have I got to lose by testifying? That would make you wonder why you brought it up during opening statement. Perhaps it does, but again, Your Honor, I think that if this is something then that counsel should have an opportunity to address herself on the collateral attack on a post-conviction hearing. The State's position, she did a good job. This was a hard case. His testimony was incriminating. There was significant evidence against him, the confidential informant's testimony along with law enforcement, and he was found with a significant amount of crack cocaine on his person. This was a hard case, and she had jurors who were holding out. They almost sent back a prim instruction. How can we say that that's ineffective assistance of counsel? Your Honors, briefly, in terms of the excessive sentence argument, all of counsel's arguments today, those were arguments that were expressly made to the trial court, and the trial court heard those arguments and, on the record, stated that he considered the defendant's criminal history, he considered the defendant's pre-sentence investigation report, considered the financial impact of incarceration, he considered all of the evidence both in aggravation and in mitigation, and he sentenced the defendant to 12 years when he was in a range of 6 to 30. Twelve years is on the lower end of the 6 to 30 spectrum. These arguments were heard by the trial court in absent and abusive discretion, which the State contends there wasn't in abusive discretion. It should not be overturned on appeal. Unless Your Honors have any other questions? I don't see any. Thank you, Your Honor. The State asks that you affirm. Thank you. Any rebuttal, counsel? I'll be brief since I took up all my time. No, you're fine. Thank you. Just a couple points. First, let's assume that everything happened, worst case for counsel, that Austin testified against her wishes. She did everything she could to try to stop him. She didn't elicit the testimony that he gave, which I think the transcript supports our argument that she did. Let's assume all of that. At that point, at least be honest with the jurors. Tell them what the law says and say, you shouldn't find him guilty under that law because this was a de minimis amount, because he was only going to share a little bit with her. That shouldn't be how you apply this law. You don't tell the jurors the wrong things about the law, that it requires an intent to sell, because the prosecutor did say over and over, the law will not instruct you as to what she's saying. She's wrong. So then I would suggest that a very plausible reason why the jury asked for the instruction was because the prosecutor had said the judge is going to instruct you on this, and you'll see that it doesn't say you need an intent to sell. When the jury got that instruction, the only real choice for them was, do we apply this law or do we not apply this law? And as Chandler said, when you leave the jury with no legal choice but to convict the defendant, that's deficient. And then one other point I would like to make is, counsel did not say these are our drugs and try to fit this within Koontz. She specifically said, if you have a glass of alcohol that's your drink, if you have a cigarette that's your drink or that you're smoking, and you hand it to someone else and they take a drag or they take a sip, that's not delivery. She was very clear it wasn't within this first Koontz exception that she was trying to apply. So if this Court does not have any further questions. Just to clarify, here in the Fourth District we're quite civilized, so you have automatic rebuttal, time reserved for rebuttal. Thank you. Thank you, counsel. We'll be in recess and take this matter under advisement.